1

2

3

4

5                    UNITED STATES DISTRICT COURT

6              FOR THE EASTERN DISTRICT OF CALIFORNIA

7

PUBLIC LANDS FOR THE PEOPLE,
8  INC., et al.,

9                                 NO. CIV. S-09-1750 LKK/JFM
           Plaintiffs,
10

      v.
11

UNITED STATES DEPARTMENT
12 OF AGRICULTURE, et al.,

13                                    O R D E R

           Defendants.
14 _____/

15       In 2008, the United States Forest Service adopted a "Travel

16 Management Plan" for the Eldorado National Forest ("2008 Plan" and

17 "ENF").  This plan limits motorized vehicle use of Forest Service

18 roads and generally prohibits cross-country motorized travel.

19       Plaintiffs are miners.  They challenge the 2008 Plan under

20 twenty causes of action, most of which invoke several theories of

21 liability.  Broadly speaking, plaintiffs argue that the plan

22 interferes with access to mining claims in the ENF.  Defendants are

23 the United States Department of Agriculture, its subsidiary the

24 United States Forest Service, and four federal officials.[1]

25 _____

26       [1] In a related action, four environmental nonprofit
    organizations challenge the 2008 Plan from a roughly opposing

                                 1

1    Defendants move for a more definite statement as to
2  plaintiffs' first claim, which alleges that defendants violated the
3  National Environmental Policy Act.  Defendants separately move to
4  dismiss claims II through XVIII and XX.  Defendants do not
5  challenge claim XIX, which is a blanket request for injunctive
6  relief, and plaintiffs do not oppose dismissal of claim XV.  For
7  the reasons stated below, the court grants both of defendants'
8  motions.

**I. Background**

10  **A.   Plaintiffs**

11    Plaintiff Public Lands for the People is a nonprofit
12  "nationwide organization of miners."  Compl. ¶ 40.  The eight
13  individual plaintiffs are all members of this organization.  Only
14  four plaintiffs are alleged to own mining claims within Eldorado
15  National Forest, although a fifth allegedly "uses" the forest and
16  a sixth allegedly sold a claim on account of the challenged plan.
17  Compl. ¶¶ 41-47.  The last two individual plaintiffs allege that
18  they have "expressed interest and desire to prospect and mine in
19  the ENF."  Compl. ¶¶ 41-42.  More generally, plaintiffs allege that
20  there are three hundred and sixty five valid existing mining
21  estates in the ENF, attributing this figure to the Bureau of Land
22  Management without citation.  Compl. ¶ 30.  Plaintiff Randy

23  _____

24  perspective.  Center for Sierra Nevada Conservation v. United
     States Forest Service, 2:09-cv-2523-LKK-JFM (E.D. Cal.).  Although
25  the court has ordered these cases related, the two cases have not
     been consolidated, and neither group of plaintiffs has intervened
26  in the others' case.

1  Burleson further alleges that he uses the ENF as an "off-road
2  enthusiast."  Compl. ¶ 45.

3  **B.    The 2008 ENF Travel Management Plan**

4       Plaintiffs in this suit challenge the Forest Service's 2008
5  Travel Management Plan for the ENF.  This plan "regulate[s]
6  unmanaged public wheeled motor vehicle use by allowing use on
7  specific National Forest Transportation System (NFTS) roads and
8  trails and prohibiting cross country travel."  Record of Decision
9  ("ROD") at 4.  The "National Forest Transportation System" does not
10 include State, county, and private roads within the ENF, nor does
11 it include forest service roads "managed for standard four wheel
12 passenger vehicles."  Final Environmental Impact Statement ("FEIS")
13 at 2-2, ix; see also ROD at 4 (noting that there are 635 miles of
14 such roads in the ENF).  Thus, the 2008 Plan does not apply to
15 these roads.

16      The first step in adoption of the 2008 Plan was taken on
17 October 16, 2005.  On that date, the Forest Service published a
18 notice of intent to prepare an environmental impact statement in
19 support of a travel management decision for the Eldorado National
20 Forest.  See FEIS at 1-9.  The Forest Service states that it took
21 this step for two reasons.

22      One reason was that in Center for Sierra Nevada Conservation
23 v. Berry, No. 2:02-cv-00325-LKK-JFM (E.D. Cal.) ("Berry") the
24 undersigned ordered the Forest Service to reexamine the issue.
25 Berry concerned a challenge to an "Off-Highway Vehicle Plan" for
26 ENF that the Forest Service adopted in 1990.  On August 16, 2005,

1  this court ordered the Forest Service to withdraw the 1990 plan and
2  to "issue a Final Environmental Impact Statement and Record of
3  Decision on a new ENF [Off-Highway Vehicle] Plan (or site-specific
4  area plans)."[2]

5       The second reason was that in 2005 the Forest Service
6  published a general rule requiring the Forest Service to designate
7  a system of roads, trails, and areas for motor vehicle use for all
8  administrative units of the National Forest System in accordance
9  with certain criteria.  This rule was published on November 9,
10  2005, subsequent to publication of the notice of intent for the
11  Eldorado Travel Management Decision. See 70 Fed. Reg. 68,264 (Nov.
12  9, 2005).[3]  It is unclear whether the 2005 Rule was influenced or
13  motivated by the Berry litigation.  Nonetheless, the Forest Service
14  indicates that the notice of intent for the Eldorado Travel
15  Management Decision was published in anticipation of the November
16  rule and that the final ENF decision comports with this rule.

17       After publication of the October 16, 2005 notice, the Forest
18  Service conducted public meetings and solicited public comments.
19  The Forest Service then published a draft Environmental Impact
20  Statement on July 20, 2007.  The draft environmental impact

21

22       [2] The August 16, 2005 order required that the new plan be
23  adopted by December 31, 2007.  On August 24, 2007, the court
    approved the parties' stipulation continuing this deadline to April
24  2, 2008.  Because of the instant matter's roots in Berry, the two
    cases have been related under E.D. Cal. Local Rule 123.

25       [3] The statutory authority invoked for this rule was the
26  Bankhead-Jones Farm Tenant Act, 7 U.S.C. § 1011 and the Wildfire
    Disaster Recovery Act of 1989, 16 U.S.C. § 551.

1  statement ("DEIS") considered five alternatives.  The Forest
2  Service ultimately adopted a modification of alternative B for the
3  2008 Plan, publishing a ROD on March 31, 2008 and a final EIS two
4  days thereafter, on April 2, 2008.  This decision allows motor
5  vehicle use on 242 miles of NFS trails and 1,002 miles of "ML-2"
6  roads, which are roads "maintained for high clearance vehicles."
7  FEIS at xviii, ix.  Plaintiffs allege that "the closure of roads,
8  rights of way, and haul roads" effectuated by the 2008 Plan
9  "affects over 50% of the total roads and rights of way in the ENF."
10  Compl. ¶ 37.

11      The parties agree that miners may in some circumstances use
12  motorized vehicles on roads closed to the general public.  Under
13  Forest Service regulations, travel management decisions do not
14  restrict "[m]otor vehicle use that is specifically authorized under
15  a written authorization issued under Federal law or regulations."
16  36 C.F.R. § 212.51(a)(8).  The Forest Service contends that miners
17  must secure such authorization by filing a Notice of Intent or Plan
18  of Operations under 36 C.F.R. § 228.4.  The EIS itself explained
19  that "[i]n the event that ground disturbing activities or the use
20  of public lands are such to warrant the need for a Plan of
21  Operations, an environmental analysis will be completed[.]  This
22  Plan of Operations or other authorization may include the use of
23  specific roads or trails not otherwise open to public wheeled motor
24  vehicle use."  FEIS at 3-212.

25      Plaintiffs contend that the 2008 Plan is flawed insofar as it
26  requires plaintiffs to utilize these procedures.  Plaintiffs

1  alternatively argue that the 2008 Plan, interpreted in light of the
2  2005 Rule, does not require miners to do so, and that the Forest
3  Service's contrary interpretation of its own plan is flawed.

4  **C.   The Notice of Intent/Plan of Operations System**

5       Although the parties disagree as to whether miners must file
6  a notice of intent and/or plan of operations prior to using roads
7  not open to the public, there is no dispute as to what the notice
8  of intent/plan of operations process itself involves.  See Park
9  Lake Resources v. United States Dep't of Agric., 197 F.3d 448, 450
10 (10th Cir. 1999) (summarizing these regulations).  A notice of
11 intent is the simpler document.  The regulation requires a notice
12 of intent for any operations that "*might cause* significant
13 disturbance of surface resources." 36 C.F.R. § 228.4(a) (emphasis
14 added). "Operations" include the use of "roads and other means of
15 access."  36 C.F.R. § 228.3(a).  The Forest Service contends that
16 use of motorized vehicles on roads not designated for such use is
17 by definition activity that "might cause significant disturbance
18 of surface resources" because such roads would otherwise remain
19 undisturbed.  Thus, at a minimum, a miner seeking to use such roads
20 must submit a notice of intent.[4]

21 ───────────────

22      [4] In United States v. Lex, 300 F. Supp. 2d 951, 961 (E.D. Cal.
   2003) (Karlton, J.), I held that under 36 C.F.R. § 228.4(a)(2) as
23 it read at that time, operations were excluded from the notice of
   intent requirement when they would not involve "use of mechanized
24 earthmoving equipment [or] . . . cutting of trees."  While I noted
   that this rule was curious, I explained that the appropriate remedy
25 was for the Forest Service to amend the regulation.  The Forest
   Service has done so, and the regulation now provides that
26 operations are exempt when they "will not involve the use of
   mechanized earthmoving equipment, such as bulldozers or backhoes,

                                  6

1    "[I]f the proposed operations *will likely cause*" a disturbance

2    of surface resources a more elaborate plan of operations is

3    required.  36 C.F.R. § 228.4(a)(3) (emphasis added).  If a miner

4    submits a notice of intent, within 15 days of receipt of the notice

5    of intent the District Ranger will determine whether the proposed

6    activity crosses the "will likely cause" threshold, such that "a

7    proposed plan of operations is required before operations may

8    begin."  36 C.F.R. § 228.4(a)(2).  Alternatively, a miner may

9    submit a plan of operations initially.  If a plan of operations is

10   submitted under either pathway, operations cannot commence until

11   the Forest Service affirmatively approves the plan.  36 C.F.R. §

12   228.12.

13       Approval of a plan of operations is a federal agency action

14   subject to the National Environmental Policy Act.  See 36 C.F.R.

15   § 228.4(f) ("Upon completion of an environmental analysis in

16   connection with each proposed operating plan, the authorized

17   officer will determine whether an environmental statement is

18   required. . . . The Forest Service will prepare any environmental

19   statements that may be required."); Hells Canyon Pres. Council v.

20   Haines, CV. 05-1057, 2006 WL 2252554, *10, 2006 U.S. Dist. LEXIS

21   54884, *32 (D. Or. 2006) (citing Cady v. Morton, 527 F.2d 786, 796

22   (9th Cir. 1975)).  Within thirty days of receipt of a plan of

23

_____

24   or the cutting of trees, *unless those operations otherwise might
     cause a significant disturbance of surface resources*."  36 C.F.R.
25   § 228.4(a)(1)(vi) (emphasis added).  See also, e.g., United States
     v. Russell, No. CR 06-0646, 2009 U.S. Dist. LEXIS 1608 (N.D. Cal.
26   Jan. 5, 2009) (Patel, J.) (noting this amendment).

1   operations, the Forest Service must either approve the plan,
2   explain that no plan is necessary, "[n]otify the operator of any
3   changes in, or additions to, the plan of operations deemed
4   necessary to meet the purpose of the regulations," or inform the
5   operator that additional time is necessary to complete review.  36
6   C.F.R. § 228.5(a)(1)-(5).  In determining whether to approve a
7   plan, the Forest Service must ensure that the plan conforms to
8   state and federal air and water quality statutes.  36 C.F.R. §
9   228.8(a)-(b).  The regulations further impose a variety of other
10  environmental standards, which typically require the operator to
11  take such measures as are "practicable."  36 C.F.R. § 228.8(c)-(g).

**D.   Procedural History**

13      Plaintiffs filed suit challenging the 2008 Plan on June 24,
14  2009.  Plaintiffs' complaint is seventy-one pages long, enumerates
15  twenty causes of action, and argues that the 2008 decision violates
16  nineteen state and federal statutes, various regulations, two
17  executive orders, the Fifth and Fourteenth Amendments to the United
18  States Constitution, and Article 1 § 7 of the California
19  Constitution.  Moreover, when confronted with ambiguity in the
20  complaint, plaintiffs have in briefing and oral argument embraced
21  each and every possible construction offered by the court and
22  defendants.[5]

---

[5] Fed. R. Civ. P. 8 requires that a complaint provide a "short
and plain" statement of the grounds for relief.  It is hard to
imagine that the complaint here is the type contemplated by the
Federal Rules.  Nonetheless, as the court reiterates several times
below, binding authority compels consideration of jurisdictional
arguments prior to evaluation of the complaint's compliance with

1    Defendants timely filed the instant motion to dismiss and
2  motion to strike on October 2, 2009.  These motions are supported
3  by memoranda of lengths commensurate with the complaint.  The
4  parties stipulated to an extended briefing schedule and several
5  continuances, after which the court heard the matter on April 19,
6  2010.  Defendants subsequently filed various supplemental exhibits
7  responding to questions raised at the hearing.  Plaintiffs objected
8  to these exhibits, and defendants replied to these objections.

9                        **II. Motion to Dismiss**

10  **A.    Standards**

11      **1.    Standard for a Fed. R. Civ. P. 12(b)(1) Challenge to**
12              **Subject Matter Jurisdiction**

13    The party seeking to invoke the jurisdiction of the federal
14  court has the burden of establishing that jurisdiction exists.
15  KVOS, Inc. v. Associated Press, 299 U.S. 269, 278 (1936); Assoc.
16  of Medical Colleges v. United States, 217 F.3d 770, 778-79 (9th
17  Cir. 2000).  On a motion to dismiss pursuant to Fed. R. Civ. P.
18  12(b)(1), the standards that must be applied vary according to the
19  nature of the jurisdictional challenge.

20    If the challenge to jurisdiction is a facial attack, i.e., the
21  defendant contends that the allegations of jurisdiction contained
22  in the complaint are insufficient on their face to demonstrate the
23  existence of jurisdiction, the plaintiff is entitled to safeguards
24  similar to those applicable when a Rule 12(b)(6) motion is made.

25  _____

26  the Federal Rules.

1  See Sea Vessel Inc. v. Reyes, 23 F.3d 345, 347 (11th Cir. 1994),

2  Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990); see

3  also 2-12 Moore's Federal Practice - Civil § 12.30 (2009).

4      If the challenge to jurisdiction is made as a "speaking

5  motion" attacking the truth of the jurisdictional facts alleged by

6  the plaintiff, a different set of standards must be applied.

7  Thornhill Pub. Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d

8  730, 733 (9th Cir. 1979).  Where the jurisdictional issue is

9  separable from the merits of the case, the district court is free

10  to hear evidence regarding jurisdiction and to rule on that issue

11  prior to trial, resolving factual disputes where necessary.

12  Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983);

13  Thornhill, 594 F.2d at 733.  "In such circumstances '[n]o

14  presumptive truthfulness attaches to plaintiff's allegations, and

15  the existence of disputed material facts will not preclude the

16  trial court from evaluating for itself the merits of jurisdictional

17  claims.'" Augustine, 704 F.2d at 1077 (quoting Thornhill, 594 F.2d

18  at 733).

19              However, where the jurisdictional issue and
             substantive issues are so intertwined that the
20           question of jurisdiction is dependent on the
             resolution of factual issues going to the
21           merits, the jurisdictional determination
             should await a determination of the relevant
22           facts on either a motion going to the merits
             or at trial.

23

24  Id. (citing Thornhill, 594 F.2d at 733-35 and 5 C. Wright & A.

25  Miller, Federal Practice & Procedure § 1350, at 558 (1969 & Supp.

26  1987)).  On a motion going to the merits, the court must employ the

1  standard applicable to a motion for summary judgment.  <u>Farr v.</u>
2  <u>United States</u>, 990 F.2d 451, 454 n.1 (9th Cir. 1993), <u>cert. denied</u>,
3  510 U.S. 1023 (1993).

4      In this case, defendants' motion is largely of the former
5  type, in that defendants largely do not dispute plaintiffs' factual
6  allegations.  On one issue, however, defendants challenge facts.
7  Defendants argue that plaintiffs had notice, both at the time the
8  2008 Plan was under consideration and at the time the instant suit
9  was filed, of which particular roads would be closed.  The court
10 addresses this factual dispute below.

11     **2.    Standard for a Fed. R. Civ. P. 12(b)(6) Motion to**
12         **Dismiss**

13     A Fed. R. Civ. P. 12(b)(6) motion challenges a complaint's
14 compliance with the pleading requirements provided by the Federal
15 Rules.  Under Federal Rule of Civil Procedure 8(a)(2), a pleading
16 must contain a "short and plain statement of the claim showing that
17 the pleader is entitled to relief."  The complaint must give
18 defendant "fair notice of what the claim is and the grounds upon
19 which it rests."  <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555
20 (2007) (internal quotation and modification omitted).

21     To meet this requirement, the complaint must be supported by
22 factual allegations.  <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, ___, 129 S.
23 Ct. 1937, 1950 (2009).  "While legal conclusions can provide the
24 framework of a complaint," neither legal conclusions nor conclusory
25 statements are themselves sufficient, and such statements are not
26 entitled to a presumption of truth.  <u>Id.</u> at 1949-50.  <u>Iqbal</u> and

1  <u>Twombly</u> therefore prescribe a two step process for evaluation of

2  motions to dismiss.  The court first identifies the non-conclusory

3  factual allegations, and the court then determines whether these

4  allegations, taken as true and construed in the light most

5  favorable to the plaintiff, "plausibly give rise to an entitlement

6  to relief."  <u>Id.</u>; <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007).

7       "Plausibility," as it is used in <u>Twombly</u> and <u>Iqbal</u>, does not

8  refer to the likelihood that a pleader will succeed in proving the

9  allegations.  Instead, it refers to whether the non-conclusory

10 factual allegations, when assumed to be true, "allow[] the court

11 to draw the reasonable inference that the defendant is liable for

12 the misconduct alleged."  <u>Iqbal</u>, 129 S.Ct. at 1949.  "The

13 plausibility standard is not akin to a 'probability requirement,'

14 but it asks for more than a sheer possibility that a defendant has

15 acted unlawfully."  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557).  A

16 complaint may fail to show a right to relief either by lacking a

17 cognizable legal theory or by lacking sufficient facts alleged

18 under a cognizable legal theory.  <u>Balistreri v. Pacifica Police</u>

19 <u>Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990).

20      In evaluating a motion to dismiss, a court may look beyond the

21 complaint itself to judicially noticeable evidence and "documents

22 whose contents are alleged in a complaint and whose authenticity

23 no party questions, but which are not physically  attached to the

24 pleading."  <u>Branch v. Tunnell</u>, 14 F.3d 449, 454 (9th Cir. 1994),

25 <u>overruled on other grounds by</u> <u>Galbraith v. County of Santa Clara</u>,

26 307 F.3d 1119, 1124 (9th Cir. 2002).  The parties agree that these

1  rules encompass the various official decisions and environmental

2  impact statements at issue here.  Despite the general obligation

3  to accept the complaint's allegations as true, the court rejects

4  allegations regarding these documents' contents where the

5  allegations are contradicted by the documents themselves.  See

6  Mullis v. United States Bankr. Ct., 828 F.2d 1385, 1388 (9th Cir.

7  1987), Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.

8  1987).

9  **B.    Preliminaries Regarding Review under Section 706(2) of**

10      **Administrative Procedure Act**

11      Plaintiffs' claims are largely governed by the Administrative

12  Procedure Act ("APA").  Plaintiffs' tenth claim alleges a violation

13  of the APA itself, arguing that defendants acted arbitrarily and

14  capriciously.  A claim that an agency acted arbitrarily and

15  capriciously for purposes of the APA cannot "stand free of any

16  other law."  Or. Natural Resources Council v. Thomas, 92 F.3d 792,

17  798 (9th Cir. 1996).  Instead, the APA provides a mechanism for

18  enforcing obligations arising under other authority.  Id.  In

19  opposing defendants' motion to dismiss, plaintiffs recharacterize

20  their tenth claim as asserting unspecified violations of the

21  National Environmental Policy Act ("NEPA").[6]  Because plaintiffs'

---

[6] Although ignored by plaintiffs' opposition, count X alleges violation of the APA separate from the claim that the Forest Service was arbitrary and capricious.  Paragraph 178 of the complaint alleges that the Forest Service violated the obligation to disclose "either the terms or substance of the proposed rule or a description of the subjects and issues involved" in conjunction with a notice of proposed rulemaking. 5 U.S.C. § 553(b)(3). Plaintiffs' supporting factual allegations, however, allege failure

13

1   first claim already seeks to enforce NEPA through the APA, the

2   tenth claim is dismissed as wholly duplicative.

3        As to the other claims, with the possible exception of

4   plaintiffs' Americans with Disabilities Act claim and plaintiffs'

5   Fifth Amendment Takings claim, all of plaintiffs' federal claims

6   invoke statutes that do not provide separate causes of action.  Nor

7   do the claims themselves specify the source of the private cause

8   of action.  Defendants characterize these claims as arising under

9   the APA, and plaintiffs do not dispute this characterization,

10  although defendants argue that certain of these claims should have

11  been brought under other statutes.  See Clouser v. Espy, 42 F.3d

12  1522, 1528 n.5 (9th Cir. 1994) (claims that agency actions "were

13  taken without statutory authority, or that they violate statutory

14  standards" should be treated as arising under the APA), Compl. ¶

15  1 (asserting generally that defendants' conduct is made reviewable

16  under the APA), ¶ 2 (invoking APA § 10), and part II(C)(3), below.

17  For these claims, the APA provides statutory limits on

18  reviewability, the governing standard of review, and limits on the

19  available remedies.  Notably, plaintiffs are not entitled to

20  monetary damages on these claims.  5 U.S.C. § 702 (waiving

21  sovereign immunity only for claims "seeking relief other than money

22  damages").  Insofar as plaintiffs' twentieth claim, for "damages,"

23  _____

24  to disclose certain *impacts* potentially at issue in the NEPA
    analysis, rather than a failure to disclose the terms or substance
25  of the rule itself.  Accordingly, assuming that plaintiffs have not
    abandoned this theory of liability, the court dismisses this
26  remaining aspect of the tenth claim as well.

1  is properly brought as a separate claim, this claim must be

2  predicated on plaintiffs' Fifth Amendment takings claim,

3  plaintiffs' ADA claim, and plaintiffs' state law claims.

4  **C.    Subject Matter Jurisdiction**

5      Defendants make four jurisdictional arguments under Fed. R.

6  Civ. P. 12(b)(1), each of which challenges many of plaintiffs'

7  claims.  Federal courts must address jurisdictional issues before

8  addressing the merits.[7]  See, e.g., Steel Co. v. Citizens for a

9  Better Env't, 523 U.S. 83, 94-95 (1998).  Defendants'

10 jurisdictional arguments concern standing, sovereign immunity,

11 ripeness, and inability to enforce broad statutory directives.

12 Defendants begin with standing, asserting that plaintiffs must

13 offer additional facts to demonstrate standing.  Defendants' other

14 arguments potentially identify deeper inadequacies unlikely to be

15 cured by amendment.  Accordingly, in hope of avoiding the need to

16 revisit these latter issues in a subsequent pleading, the court

17 addresses defendants' arguments in reverse order.  See Tenet v.

18 Doe, 544 U.S. 1, 6 n.4 (2005) (when confronted by multiple

19 jurisdictional questions, a court may address these questions in

20 any order.).  Roughly stated, defendants argue (1) that the

21 statutory directives invoked by plaintiffs are not judicially

22 enforceable, such that certain claims cannot be brought *at all*, (2)

23 that certain claims are unripe, and cannot be brought *yet*, (3) that

24

25      [7] Defendants have not brought a jurisdictional challenge to
   plaintiffs' tenth claim, which the court dismissed in the preceding
26 section.

1  for certain claims, the United States has waived sovereign immunity

2  narrowly, requiring claims to be brought *under a different statute*,

3  and (4) that plaintiffs lack standing for many claims, such that

4  plaintiffs  must  provide  additional  allegations  or  evidence

5  demonstrating that *these plaintiffs* have standing.

6       **1.   Enforceability of Broad Mandates**

7       Defendants argue that claims III, V through VII, XI, and XIV

8  should be dismissed because they "seek to compel implementation of

9  broad programmatic directives rather than 'discrete agency action

10 that [the Forest Service] is required to take.'"  Defs.' Reply Br.

11 13 (quoting <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 64

12 (2004)) (emphases omitted).[8]  Defendants concede that the 2008 Plan

13 represents discrete and final agency action reviewable under the

14 APA.   Defendants  nonetheless  argue  that  the  Plan's  alleged

15 deficiencies  concern  policy  mandates  that  are  not  judicially

16 enforceable.  As the court explains, insofar as <u>Norton</u> holds that

17

18       [8] Defendants' opening memorandum characterized this argument
   as speaking to the merits under Fed. R. Civ. P. 12(b)(6), whereas
19 defendants' reply memorandum frames this as a jurisdictional issue.
       <u>Norton</u> was decided on the APA's statutory language rather than
20 constitutional  limits,  although  the  analysis  shows  that  the
   relevant portions of the APA were crafted to navigate underlying
21 separation of powers and justiciability concerns. While <u>Norton</u> did
   not state whether the APA's limits were jurisdictional, it appears
22 that  they  are.   <u>Siskiyou  Reg'l  Educ.  Project  v.  United  States
   Forest  Serv.</u>, 565 F.3d 545, 554 (9th Cir. 2009) (assuming that
23 <u>Norton</u>  described  a  jurisdictional  limit),  <u>Ctr.  for  Biological
   Diversity  v.  Veneman</u>, 394 F.3d 1108, 1113 (9th Cir. 2005) (<u>Norton</u>
24 describes jurisdictional limits), <u>but see Idaho Watersheds Project
   v. Hahn</u>, 307 F.3d 815, 829 (9th Cir. 2002) (holding that the
25 finality requirement in 5 U.S.C. § 704 is nonjurisdictional, and
   suggesting that this was generally true of the APA's limits on
26 claims).

1   broad mandates are unenforceable, this holding applies solely to
2   "failure to act" claims under 5 U.S.C. § 706(1) and has no
3   applicability to the claims at issue here, which challenge
4   completed agency action under § 706(2).

5       <u>Norton</u> concerned the Bureau of Land Management's ("BLM")
6   regulation of off-road vehicle use in federal "wilderness study
7   areas."  These areas are federal lands that BLM had identified as
8   potential wilderness, but which Congress had not yet decided
9   whether to protect as wilderness.  542 U.S. at 59.  Until Congress
10  reaches a decision, BLM is obliged to manage these areas "'in a
11  manner so as not to impair the suitability of such areas for
12  preservation as wilderness.'"  <u>Id.</u> (quoting 43 U.S.C. § 1782(c)).
13  BLM had adopted a "land use plan" (also referred to as a "resource
14  management plan") for the areas at issue in <u>Norton</u>, and this plan
15  contained various provisions regarding regulation of off-road
16  vehicle use.  <u>Id.</u> at 61.

17      Plaintiffs in <u>Norton</u> brought three claims, only the first of
18  which is relevant here.  Plaintiffs argued "that BLM had violated
19  its nonimpairment obligation under § 1782(c) by allowing
20  degradation in certain [wilderness study areas]" under the
21  challenged plan, thereby "fail[ing] to take action with respect to
22  ORV use that [BLM] was required to take."  <u>Id.</u> at 60-61.  This
23  claim was brought under section 706(1) of the APA, to "compel
24  agency action unlawfully withheld or unreasonably delayed."

25      The Court held that the statutory obligation to "'manage
26  [wilderness study areas] . . . in a manner so as not to impair the

17

suitability of such areas for preservation as wilderness,'" was "mandatory as to the object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve it."  Id. at 66 (quoting 43 U.S.C. § 1782(c)).  The court explained the limits to enforcement of such a mandate:

> The principal purpose of the APA limitations we have discussed--and of the traditional limitations upon mandamus from which they were derived--is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved--which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. To take just a few examples from federal resources management, a plaintiff might allege that the Secretary had failed to "manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance," or to "manage the [New Orleans Jazz National] [H]istorical [P]ark in such a manner as will preserve and perpetuate knowledge and understanding of the history of jazz," or to "manage the [Steens Mountain] Cooperative Management and Protection Area for the benefit of present and future generations."   16 USC §§ 1333(a), 410bbb-2(a)(1), 460nnn-12(b). The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

Norton, 542 U.S. at 66-67.  As this court reads Norton, it prohibits "*general orders* compelling compliance with broad

statutory mandates" and "*pervasive oversight* . . . over the manner
and pace of compliance" with broad mandates, but Norton did not
hold that broad mandates are absolutely unenforceable.  Instead,
Norton recognized concerns raised by judicial enforcement of such
mandates and explained that the limits provided by the APA address
these concerns.

   First, only "discrete agency action" may be reviewed under the
APA.  Norton, 542 U.S. at 62 (citing 5 U.S.C. § 551).  Courts may
determine whether particular actions violate broad mandates, but
the APA does not permit courts to oversee agencies wholesale.
Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 891 (1990).  Thus,
judicial review under the APA will always be confined to a bounded
set of facts.

   Second, the terms of sections 706(1) and (2) provide narrow
standards of review.  Section 706(2), which was not at issue in
Norton, directs courts to set aside actions that are, inter alia,
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law."  Courts ask whether the evidence before
the agency at the time a discrete decision was made rationally
supports the decision reached by the agency.  This deference to the
agency permits judicial enforcement of broad mandates without the
"pervasive oversight" rejected by Norton.  Norton, 542 U.S. at 62.
Although Norton may be read as suggesting that it is inappropriate
for a court to ever "determine whether compliance [with a broad
statutory mandate] was achieved," the language surrounding the
quoted phrase demonstrates that the Court was concerned with such

19

1   determinations only to the extent that they would require excessive

2   intrusion on the agency.   542 U.S. at 66.

3          Section 706(1), which permits claims for failure to act, does

4   not incorporate the arbitrary or capricious standard.  It would be

5   difficult to apply this standard where the agency has neither acted

6   nor decided not to act, because in such cases there will be no

7   administrative record underlying an agency decision.   Section

8   706(1) accommodates this concern by specifying a different standard

9   of review--"unlawfully withheld or unreasonably delayed." Norton

10  interpreted this language to apply only to actions the agency is

11  legally require to take.    Norton at 63, 63 n.1.   This

12  interpretation effectively precludes enforcement of broad statutory

13  mandates under section 706(1), insofar as a broad mandate typically

14  is not one that requires discrete agency action.  This result,

15  however, derives from the particular language of section 706(1),

16  language which does not apply to claims under section 706(2).

17  Moreover, as explained above, the policy concerns underlying this

18  limitation are separately addressed through the standard of review

19  provided by section 706(2).

20          In several related contexts, the Ninth Circuit has

21  distinguished Norton on grounds supporting the above analysis,

22  recognizing that Norton's interpretation of section 706(1) was

23  inapplicable to claims under section 706(2). Oregon Natural Desert

24  Ass'n v. BLM, 531 F.3d 1114, 1140 (9th Cir. 2008), Northwest Envtl.

25  Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 681 n.10 (9th

26  Cir. 2007).  Notably, Oregon Natural Desert Ass'n held that a NEPA

analysis could be arbitrary and capricious under section 706(2) for failing to analyze specific factors even though the omitted analysis could not separately be compelled under § 706(1) as an action that the agency was "required to take."  531 F.3d at 1140. In summary, where a statutory directive does not require action, the statute may be so "broad" that it cannot be enforced under section 706(1) without being too broad to be enforced under section 706(2).

There are, of course, certain statutory directives that are so broad that they defy review under the arbitrary and capricious standard as well.  The APA exempts from review "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  "An agency action is 'committed to [its] discretion by law' where a 'statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion' -- i.e., where it is 'drawn in such broad terms that in a given case there is no law to apply.'"  Pac. Northwest Generating Coop. v. Bonneville Power Admin., 596 F.3d 1065, 1075 n.7 (9th Cir. 2010) (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).  Such statutes are "rare instances," Heckler, 470 U.S. at 830, and this exception is "very narrow."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). Defendants have not sought to invoke this exception here--instead, defendants erroneously argue that the only action reviewable under any provision of the APA is action that is legally required.

1  Because the court dismisses the challenged claims on other
2  jurisdictional grounds, the court declines to address § 701(a)(2)
3  sua sponte.  If plaintiffs file an amended complaint curing the
4  jurisdictional defects identified below, defendants may bring an
5  argument invoking section 701(a)(2).

6      In this case, plaintiffs challenge a discrete and final agency
7  action--publication of the 2008 ENF Travel Management Plan--under
8  5 U.S.C. § 706(2).  Norton presents no barrier to such claims.

9      **2.   Ripeness**

10     In the context of review of agency action, the ripeness
11 doctrine serves "to prevent the courts, through avoidance of
12 premature adjudication, from entangling themselves in abstract
13 disagreements over administrative policies, and also to protect the
14 agencies from judicial interference until an administrative
15 decision has been formalized and its effects felt in a concrete way
16 by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S.
17 136, 148-49 (1967).  The doctrine is "'drawn both from Article III
18 limitations on judicial power and from prudential reasons for
19 refusing to exercise jurisdiction.'"  Nat'l Park Hospitality Ass'n
20 v. Dep't of Interior, 538 U.S. 803, 808 (2003) (quoting Reno v.
21 Catholic Social Services, Inc., 509 U.S. 43, 57, n.18 (1993))
22 (hereinafter "Nat'l Park Hospitality").

23     "In deciding whether an agency's decision is, or is not, ripe
24 for judicial review, the Court . . . must consider: (1) whether
25 delayed review would cause hardship to the plaintiffs; (2) whether
26 judicial intervention would inappropriately interfere with further

1    administrative action; and (3) whether the courts would benefit

2    from further factual development of the issues presented." Ohio

3    Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998)

4    (hereinafter "Ohio Forestry").  Other decisions have combined the

5    second and third factors from the Ohio Forestry into a single

6    inquiry, the "fitness of the issues for judicial decision."  See

7    Nat'l Park Hospitality, 538 U.S. at 808 (citing Abbott Labs, 387

8    U.S. at 808).[9]   Courts may analyze fitness before considering

9    hardship to the parties.  Park Lake Resources, 197 F.3d at 450.

10        Defendants argue that claims II, VI through IX, XI through

11   XIII, XVI, XVII, XVIII, and XX are unripe.  Each of these claims

12   relates to limits on miners' vehicle travel.  When questioned about

13   the contours of these claims, plaintiffs have eagerly embraced

14   every possible construction of these claims suggested by either

15   defendants or the court.  Construing the complaint liberally, the

16   challenged claims allege four theories of injury.  Plaintiffs

17   contend that all claims challenged on ripeness grounds argue

18   that(1) the 2008 Plan limits miners' access to mining sites because

19   the Forest Service will refuse to grant exemptions even when miners

20   follow the notice of intent/plan of operations process, (2) even

21   if the Forest Service will grant exceptions, the burdens involved

22   in the notice of intent/plan of operations process are so great as

23

24        [9] Using of the term "fit" to describe only one aspect of the
     ripeness inquiry may seem to prejudge the issue, in that common
25   sense suggests that an issue "unfit" for review is "unripe"
     regardless of hardship.  Having noted this terminological oddity,
26   the court uses "fit" in accordance with the caselaw, as describing
     only one aspect of the ripeness inquiry.

to amount to a <u>de facto</u> prohibition on mining, and (3) the Forest Service has no authority to require miners who seek to use roads to comply with the notice of intent/plan of operations process. Beyond these substantive arguments, in opposing defendants' sovereign immunity argument (discussed below), plaintiffs contend that a subset of the challenged claims present a procedural theory of liability, arguing that the Forest Service was required to determine whether the 2008 Plan would affect easements and other rights of way before adopting the plan.[10]

---

[10] To clarify, each claim challenged on ripeness grounds alleges, in a shotgun fashion, numerous theories of liability. It appears that each such theory depends on at least one of the above four arguments. For example, Claims II, VI, VII, XI, and XII argue that the 2008 Plan violates statutory prohibitions on interference with mining. Claim VII elaborates on this by further arguing that due process required individualized notice and a hearing prior to such interference. This added theory does not complicate the ripeness analysis, however, because if the question of whether there will be interference is unripe, the question of whether such interference would violate due process is unripe as well.

To summarize the other claims, Claim XIII argues that the 2008 Decision violates the Americans with Disabilities Act by limiting disabled persons' ability to mine. Claims XVI and XVII argue that the Decision violated easements, implied rights of use, or unspecified property rights related to mining claims. Claim XVIII is a generalized claim for "takings," and claim XX is a general claim for "damages." Finally, claims VIII and IX argue that the 2008 Plan closed public rights of way recognized under Revised Statute 2477, in violation of FLPMA and the Omnibus Act of 1996, Pub. L. No. 104-208, § 108, respectively. R.S. 2477 is described in detail in <u>Kane County Utah v. Salazar</u>, 562 F.3d 1077, 1079 (10th Cir. 2009). Although R.S. 2477 provides a right of access to the general public, rather than to miners in particular, plaintiffs explicitly predicate their R.S. 2477 claims on miners' rights. <u>See, e.g.</u>, Compl. ¶¶ 165, 173.

Although these four theories encompass the challenged claims, for each individual claim it is unclear which theories that claim implicates. Moreover, plaintiffs provide contradictory indication as to whether they intend to proceed under the fourth theory at all. Plaintiffs state, in opposition to dismissal of count XVIII, that plaintiffs "do not allege that the Forest Service has to

1    The ripeness of each of these theories of liability must be

2    considered separately.   See, e.g., Reno v. Catholic Social

3    Services, Inc., 509 U.S. 43, 56-65 (1993), Freedom to Travel

4    Campaign v. Newcomb, 82 F.3d 1431, 1434-36, (9th Cir. 1996).   As

5    explained below, the latter two theories are ripe, but the first

6    two are not.[11]

7         **a.   Fitness of the Issues for Judicial Decision**

8    Defendants rely on three cases in which courts held that

9    challenges to broad agency decisions would need to await fact-

10   specific applications of the decisions.   In Ohio Forestry, 523 U.S.

11   at 729, plaintiffs challenged a Land and Resource Management Plan

12   adopted by the Forest Service.   Plaintiffs argued that the plan

13   _____

14   identify every R.S. 2477 road in the ENF. . . . Plaintiffs allege
     that if a road is a R.S. 2477 road, then the Forest Service cannot
15   close it to miners and prospectors, prohibiting them from accessing
     their mining claims." Opp'n at 27.  At oral argument, however,
16   plaintiffs appeared to embrace the fourth theory.  For purposes of
     the present motion, the court assumes that plaintiffs intended to
17   bring all four theories, and the court need not determine which
     theories may be supported by the allegations and arguments included
18   in particular causes of action.

19       [11] Other cases have rejected the third and fourth theories on
     the merits.  As to the third, the Ninth Circuit has held that the
20   Forest Service has authority to require miners to comply with the
     notice of intent and plan of operations procedures.  See Siskiyou
21   Reg'l Educ. Project v. United States Forest Serv., 565 F.3d 545,
     549 n.1 (9th Cir. 2009) (citing Cal. Coastal Comm'n v. Granite Rock
22   Co., 480 U.S. 572, 585 (1987)) (stating in dicta that the National
     Forest Management Act provides the Forest Service with authority
23   to regulate surface activities associated with mining), United
     States v. Doremus, 888 F.2d 630, 632 (9th Cir. 1989) (upholding
24   application of the notice of intent/plan of operations process to
     miners).  As to the fourth, the Tenth Circuit held that plaintiffs
25   presenting such a claim had failed to identify any authority
     imposing such a procedural obligation.  Kane County Utah v.
26   Salazar, 562 F.3d 1077, 1086-88 (10th Cir. 2009).

1  favored logging and clearcutting in national forests in violation

2  of various statutory duties.  The Court explained that

> immediate judicial review directed at the
> lawfulness of logging and clearcutting
> [pursuant to the challenged plan] could hinder
> [the Forest Service's] efforts to refine its
> policies: (a) through revision of the Plan,
> e.g., in response to an appropriate proposed
> site-specific action that is inconsistent with
> the Plan, or (b) through application of the
> Plan in practice, e.g., in the form of
> site-specific proposals, which proposals are
> subject to review by a court applying purely
> legal criteria.

10  523 U.S. at 735 (internal citation omitted).  Thus, the issue was

11  unfit for review.

12      In Nat'l Park Hospitality, plaintiffs challenged an

13  interpretive rule published by the National Parks Service, which

14  held that contracts with concessioners were outside the scope of

15  the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq.  The

16  Court concluded that "[a]lthough the question presented . . . is

17  a purely legal one and [the challenged action] constitutes final

18  agency action within the meaning of § 10 of the APA, 5 USC § 704,

19  . . . further factual development would significantly advance our

20  ability to deal with the legal issues presented."  Nat'l Park

21  Hospitality, 538 U.S. at 812 (quotation and other citations

22  omitted).  The majority based this conclusion on the potential for

23  case-specific refinement of the stated policy.  While the

24  government "generally argue[s] that [the National Park Service] was

25  correct to conclude that the [Contract Disputes Act] does not cover

26  concession contracts, [it] acknowledge[s] that certain types of

1  concession contracts might come under the broad language of the
2  [Act]. Similarly, while [the two concessioners] present a facial
3  challenge to [the interpretation], both rely on specific
4  characteristics of certain types of concession contracts to support
5  their positions." Id. Because, in the majority's view, all
6  parties agreed that the agency might adjust its position in light
7  of the facts of specific contracts and that these facts would bear
8  on the lawfulness of the agency's position, the abstract, facial
9  challenge was not fit for review. Justices Stevens (concurring)
10 and Breyer and O'Connor (dissenting) disagreed with the underlying
11 conclusion that case-specific agency action was forthcoming or
12 pertinent. These justices' opinions thereby illustrated
13 application of the same rule to alternative facts. They would have
14 held that the agency had adopted a blanket policy not subject to
15 case-specific deviations, and therefore fit for review. Id. at
16 814-15 (Stevens, J., concurring), id. at 819-20 (Breyer, J., joined
17 by O'Connor, J., dissenting).

18     Finally, in the case that is perhaps the closest factual
19 analogue to the present dispute, the Tenth Circuit has reviewed a
20 challenge to a Forest Service decision that potentially limited
21 miners' access to mine sites in a national forest. Park Lake
22 Resources, 197 F.3d 448. The Forest Service had designated nearly
23 700 acres as a "Research Natural Area" pursuant to 36 C.F.R. §
24 251.23 (1998). Such areas must be "retained in a virgin or
25 unmodified condition," and in accordance with this designation, the
26 Forest Service prohibited motorized vehicle use except when

1   necessary to provide research or educational access.  Id. at 449.

2   The Tenth Circuit held that the miners' challenge to this

3   designation was not fit for judicial review because the miners had

4   not presented a plan of operations seeking approval of a particular

5   mining proposal.  Id. at 451.  Had plaintiffs filed a plan of

6   operations, the Forest Service could have approved it despite the

7   Research Natural Area designation.  If the Forest Service instead

8   denied the proposal or required modifications thereto, such action

9   could be predicated on a range of statutory and regulatory

10  authorities, and judicial review of such an action would turn on

11  the particular authority invoked.  Id.; see also Tex. v. United

12  States, 523 U.S. 296, 300 (1998), Toilet Goods Ass'n, Inc. v.

13  Gardner, 387 U.S. 158, 163 (1967) (issue unfit for review because

14  "[a]t this juncture we have no idea whether or when such an

15  inspection will be ordered and what reasons the Commissioner will

16  give to justify his order.").  Moreover, the Forest Service could

17  modify the Research Natural Area designation in light of proposed

18  mining.   The Tenth Circuit held that these facts were

19  indistinguishable from those in Ohio Forestry, and that the claim

20  was therefore not yet fit for review.  Park Lake Resources, 197

21  F.3d at 452.

22      These cases demonstrate that insofar as the claims here argue

23  that the 2008 Plan prohibits access to mining sites, the claims are

24  not fit for judicial decision.  When presented with project-

25  specific notices of intent or plans of operation, the Forest

26  Service may approve such plans, with or without modification.  Nor

1   can the court yet review the argument that the burden imposed on

2   miners by the notice of intent/plan of operations process amounts

3   to a prohibition on mining.  The regulations themselves contemplate

4   that the weight of this burden will vary greatly from proposal to

5   proposal.  36 C.F.R. § 228.4(g) ("The public reporting burden for

6   this collection of information is estimated to vary from a few

7   minutes for an activity involving little or no surface disturbance

8   to several months for activities involving heavy capital

9   investments and significant surface disturbance, with an average

10  of 2 hours per individual response.").  The precise amount of time

11  required is at least in part under the control of the Forest

12  Service.  It remains to be seen how often the Forest Service will

13  require a plan of operations, how long such a plan will take to

14  prepare or review, and what expense will be involved therein.

15      Plaintiffs' remaining contentions are fit for review.  As to

16  the claim that Forest Service lacks the authority to require miners

17  to submit a notice of intent or plan of operations at all, the

18  Forest Service has already determined that a notice of intent is

19  required for any operation that would use roads not open to the

20  general public.  FEIS 3-212, 36 C.F.R. §§ 228.4, 212.55(d).  Miners

21  are prohibited from such use of roads prior to Forest Service

22  approval.  Defendants effectively concede that there will be no

23  case-specific determination as to whether a notice of intent is

24  required.  In this regard, this theory of liability is distinct

25  from the claims discussed in Ohio Forestry, Nat'l Park Hospitality,

26  and Park Lake Resources; this theory of liability is instead the

1   type of "blanket" decision that Justices Stevens, Breyer and

2   O'Connor held was fit for judicial review on a facial challenge in

3   Nat'l Park Hospitality.   Rather than argue that further agency

4   action or factual development is necessary with regard to this

5   theory of liability, defendants argue that plaintiffs have not

6   shown that valid rights of way exist, that the Forest Service's

7   regulations do not otherwise exempt miners from notice of intent

8   requirement, and that the Forest Service has the authority to

9   impose this requirement.   See, e.g., Defs.' Reply at 7-8.   Although

10  defendants characterize these arguments as jurisdictional, they

11  instead speak to the merits.   Notably, defendants argue that "[t]o

12  the extent Plaintiffs allege that they hold pre-existing rights-of-

13  way even without approval of a plan of operations, Plaintiffs

14  cannot allege ripe challenges to the Decision prior to carrying

15  their burden of proving the validity of the rights-of-way they

16  claim."   Defs.' Mem. at 23 (citing S. Utah Wilderness Alliance v.

17  BLM, 425 F.3d 735, 768 (10th Cir. 2005)).   The cited case held

18  that, in reviewing the merits of a claim asserting rights to an

19  R.S. 2477 roadway, the party asserting the right bore the burden

20  of proof.   Ripeness was not an issue in that case.   While

21  plaintiffs here may fail to meet the burden of proof on the R.S.

22  2477 claims, this is a merits analysis separate from ripeness and

23  other justiciability inquiries.

24      As to the claim that the Forest Service was required to

25  evaluate impacts on existing property rights prior to adopting the

26  2008 Plan, the Ninth Circuit has held that procedural, rather than

1  substantive, challenges to agency action are fit for decision and
2  ripe once the action is complete.  Laub v. U.S. Dep't of Interior,
3  342 F.3d 1080, 1090 (9th Cir. 2003), Citizens for Better Forestry
4  v. U.S. Dep't of Agriculture, 341 F.3d 961, 977 (9th Cir. 2003),
5  Kern v. BLM, 284 F.3d 1062, 1070-71 (9th Cir. 2002), West v. Sec'y
6  of Dep't of Transp., 206 F.3d 920, 930 n.14 (9th Cir. 2000),
7  Wilderness Soc'y v. Thomas, 188 F.3d 1130, 1133 n.1 (9th Cir.
8  1999).

9           **b.   Hardship to Plaintiffs**

10         In assessing whether delayed review will impose a hardship on
11  plaintiffs, the core inquiry is the nature of the challenged
12  action.  The Court has held that there is no hardship where the
13  challenged actions "do not command anyone to do anything or to
14  refrain from doing anything; they do not grant, withhold, or modify
15  any formal legal license, power or authority; they do not subject
16  anyone to any civil or criminal liability; they create no legal
17  rights or obligations."  Ohio Forestry, 523 U.S. at 733 (citing
18  United States v. Los Angeles & Salt Lake R. Co., 273 U.S. 299,
19  309-10 (1927) (Brandeis, J.)).  In contrast, the Court has found
20  hardship when a challenged rule required plaintiff drug
21  manufacturers to either "change all their labels, advertisements,
22  and promotional materials; . . . destroy stocks of printed matter;
23  and . . . invest heavily in new printing type and new supplies" or
24  to "risk serious criminal and civil penalties for the unlawful
25  distribution of 'misbranded' drugs."  Abbott Labs, 387 U.S. at 152-
26  53.

1    By focusing on changes in legal right or obligation, the
2  ripeness doctrine's hardship inquiry excludes certain harms from
3  consideration.  For example, Ohio Forestry recognized that it would
4  be cheaper and more expedient for plaintiffs to litigate a single
5  facial challenge to the disputed land use plan than to challenge
6  individual applications thereof.  523 U.S. at 734.  Litigation
7  expense and inconvenience, however, were not the type of hardship
8  "sufficient by itself to justify review in a case that would
9  otherwise be unripe."  Id. at 735.  Similarly, in Nat'l Park
10 Hospitality, because the challenged interpretation pertained solely
11 to how contractual disputes would be resolved, the rule did not
12 affect the concessioners' "primary conduct," and the concessioners
13 were "free to conduct [their] business as [they] saw fit."  538
14 U.S. at 810.  As such, the interpretation was not a command, a
15 prohibition, or a license.  Id. at 809 (citing Ohio Forestry).
16 Although the concessioners argued that the interpretation created
17 uncertainty as to whether the concessioners would be able to invoke
18 the cost-saving dispute resolution provisions of the Contract
19 Disputes Act, the Court held that this type of harm was irrelevant.
20 Id. at 811.  The mere fact that "business transactions could be
21 priced more accurately if . . . a small portion of existing legal
22 uncertainties were resolved" was inadequate to create a hardship
23 pertinent to the ripeness inquiry.  Id.  The Court further observed
24 that the challenged interpretation was a "general statement of
25 policy" rather than a "legislative regulation with the force of
26 law."  Id. at 808-09.

1    Here, although the challenged plan does not conclusively
2   prohibit miners' motorized travel on formerly open roads, the plan
3   commands the miners to refrain from such travel absent application
4   for and receipt of a grant of permission, and subjects the miners
5   to criminal and civil liability should they proceed without such
6   authorization.  See Bator v. United States, No. Cr. S-09-424, 2010
7   U.S. Dist. LEXIS 57705 (E.D. Cal. May 19, 2010) (affirming criminal
8   conviction for mining operations conducted in a national forest
9   without authorization).  Thus, miners must either refrain from
10  using roads or pay the as-yet uncertain cost of filing a notice of
11  intent or plan of operations.

12    Although Ohio Forestry and Nat'l Parks Hospitality held that
13  certain costs incident to agency action were not hardships
14  pertinent to the ripeness analysis, the Ninth Circuit has held that
15  costs directly commanded by agency action are relevant.  Sayles
16  Hydro Ass'n v. Maughan, 985 F.2d 451, 454 (9th Cir. 1993).  In
17  Sayles, plaintiffs had the requisite federal licenses to construct
18  a hydroelectric power project, but the California State Water
19  Resources Control Board had not issued a required permit.
20  Plaintiff challenged the process imposed by the Board, and the
21  Board argued that because this process was not complete, the
22  challenge was unripe.  The Ninth Circuit explained that "[i]f a
23  federal licensee must spend years attempting to satisfy an
24  elaborate, shifting array of state procedural requirements, then
25  he must borrow a fortune to pay lawyers, economists, accountants,
26  archaeologists, historians, engineers, recreational consultants,

1   environmental consultants, biologists and others, with no revenue,

2   no near-term prospect of revenue, and no certainty that there ever

3   will be revenue." Id.

4       Defendants argue, without discussion of Sayles, that the

5   burdens of compliance with administrative procedures cannot

6   constitute a hardship for purposes of ripeness.[12]  The decisions

7   cited by defendants concerned a separate question: whether agency

8   action is final for purposes of the Administrative Procedure Act.

9   FTC v. Std. Oil Co., 449 U.S. 232, 244 (1980), Ukiah Valley Medical

10  Center v. FTC, 911 F.2d 261, 264 (9th Cir. 1990).  These two cases

11  concerned challenges to issuance of administrative complaints, and

12  held that although the agency action obliged plaintiff to incur the

13  "expense and disruption of defending itself in protracted

14  adjudicatory proceedings," such injury was insufficient to render

15  the action "final agency action" under the APA.  Std. Oil, 449 U.S.

16  at 244; see also Ukiah Valley Med. Center, 911 F.2d at 264.  In

17  this case, plaintiffs do not rely on the cost of proceedings to

18  demonstrate the finality of agency action.  The administrative

19  complaints at issue in Standard Oil and Ukiah Valley marked the

20  beginning of the administrative process, but here, the challenged

21  decision was reached at the culmination of the NEPA process and

22  is undoubtedly a "final agency action" within the meaning of the

23  APA.  Accordingly, the statutory limit recognized by Standard Oil

24  and Ukiah Valley is absent here.

25  _____

26      [12] The court recognizes that plaintiffs did not cite Sayles
    either.

1          **c.   Weighing Hardship against Fitness for Review**

2          Accordingly, the court concludes that two of the issues are

3   unfit for judicial review, two of the issues are fit, and that the

4   plan (and hence delayed review thereof) imposes some hardship on

5   the plaintiffs.   <u>Abbott Labs</u>, <u>Ohio Forestry</u>, <u>Nat'l Park</u>

6   <u>Hospitality</u>, and <u>Park Lake Resources</u> provide no direct guidance for

7   situations in which the fitness and hardship aspects of the

8   ripeness inquiry point in opposing directions.   Indeed, neither

9   party has cited a case discussing synthesis of these factors or,

10  more specifically, how to approach situations in which the ripeness

11  factors provide contrary indications.

12         Beginning with the two theories of liability that are fit for

13  review, the D.C. Circuit has repeatedly held that where an issue

14  is fit for review, the ripeness doctrine imposes no independent

15  "hardship" requirement beyond the requirement of injury sufficient

16  to convey Article III standing.   <u>See, e.g.</u>, <u>AT&T Corp. v. FCC</u>, 349

17  F.3d 692, 700 (D.C. Cir. 2003), <u>Payne Enterprises, Inc. v. United</u>

18  <u>States</u>, 837 F.2d 486, 493 (D.C. Cir. 1988).   Neither the Ninth

19  Circuit nor the Supreme Court have explicitly addressed this

20  question, but the court is not aware of any decision holding to the

21  contrary.   Put differently, no binding authority has concluded that

22  an issue was fit for review, that the plaintiff had demonstrated

23  injury sufficient to convey standing, but that the lack of further

24  hardship demonstrated that the issue was unripe.[13]   Because the

25  _____

26         [13] Standing and ripeness doctrines overlap, and as such, few
    cases have squarely addressed whether ripeness may require a

1   D.C. Circuit's rule properly reflects the concerns underlying the

2   ripeness doctrine, the court follows this rule here.  Accordingly,

3   although the amount of hardship is uncertain and potentially

4   minimal, these two theories of liability are ripe so long as the

5   hardship is sufficient to demonstrate Article III standing.  The

6   court postpones the standing question until part II(C)(6), below.

7       As to the two theories of liability that are unfit review, the

8   question is whether a sufficient showing of hardship may render the

9   issues ripe notwithstanding the determination of unfitness, and if

10  so, whether such a hardship has been shown here.  The court assumes

11  that a severe hardship may outweigh a showing of unfitness,

12  although the court is not aware of any decision finding a claim

13  ripe for this reason.  The Supreme Court has stated in dicta that

14  the converse is possible, i.e., that a claim may be unripe despite

15  a showing of definite hardship. <u>Babbitt v. United Farm Workers

16  Nat'l Union</u>, 442 U.S. 289, 300 (1979) (quoting <u>Req'l Rail

17  Reorganization Act Cases</u>, 419 U.S. 102, 143 (1974)) ("Even though

18  a challenged statute is sure to work the injury alleged, however,

19  adjudication might be postponed until 'a better factual record

20  ─────────────

21  showing of hardship beyond that required by standing.  <u>C.f.</u> <u>Nat'l
    Park Hospitality</u>, 538 U.S. at 815 (Stevens, J., concurring).  In

22  <u>Nat'l Park Hospitality</u>, Justice Breyer's dissent characterized the
    majority as having concluded that plaintiffs had standing

23  notwithstanding the fact that plaintiffs had not demonstrated a
    hardship for the ripeness inquiry.

24      The D.C. Circuit has explicitly reached such a conclusion,
    holding that plaintiffs had standing to bring a claim which was

25  nonetheless unripe, basing the ripeness conclusion both on the
    unfitness for judicial resolution and the lack of hardship.  <u>Nat'l

26  Treasury Emples. Union v. Chertoff</u>, 452 F.3d 839, 855 (D.C. Cir.
    2006).

1  might be available.'"). In this case, the minimal hardship
2  plaintiffs will suffer does not warrant immediate judicial
3  adjudication of plaintiffs' claims that the Plan will prohibit
4  mining.

5      Accordingly, claims II, VI through IX, XI through XIII, XVI,
6  XVII, XVIII, and XX are dismissed as unripe insofar as they argue
7  that the 2008 Plan will result in de jure or de facto prohibition
8  of motorized vehicle access to mining claims. All of these claims
9  are ripe insofar as they involve the third and fourth theories of
10 liability discussed above.

11      **3.   Sovereign Immunity and The Quiet Title Act**

12     Suits against the United States are barred absent a waiver of
13 sovereign immunity. Block v. N.D., 461 U.S. 273, 280 (1983).
14 Where claims "challenge the United States' title to real property,"
15 the United States has provided a narrow waiver, consenting only to
16 those suits that may be brought under the Quiet Title Act ("QTA"),
17 28 U.S.C. § 2409a. Block, 461 U.S. at 286; see also Leisnoi, Inc.
18 v. United States, 170 F.3d 1188, 1191 (9th Cir. 1999). If an
19 adverse claim to title to real property cannot be brought under the
20 QTA, it cannot be brought at all. Leisnoi, 170 F.3d at 1191
21 (citing Alaska v. Babbitt, 75 F.3d 449, 453 (9th Cir. 1996)
22 ("Alaska II"). Where a claim involves a title dispute, a plaintiff
23 cannot circumvent this bar by, for example, posturing the claim as
24 one against a federal official or as a claim that a government
25 agency action was ultra vires. Alaska II, 75 F.3d at 453.

26     Here, defendants argue that claims II, VI through IX, XVI, and

37

XVII all present adverse claims to title to real property, that
none of these are brought under the QTA, and that these claims are
therefore barred by the United States' sovereign immunity.[14]
Defendants separately argue that sovereign immunity bars counts
XIV, XVIII, and XX for reasons other than the QTA.   The court
discusses these claims in parts II(C)(4) and (5), below.

To determine whether a cause of action presents an adverse
claim to real property, the court must look to the particulars of
the cause of action.   The court reiterates that the complaint in
this case is such that these particulars are difficult to discern.
As noted in the prior section, these challenged claims advance two
ripe theories of liability: the substantive argument that the
Forest Service lacks authority to require miners to receive
approval for a notice of intent or plan of operations before using
closed roads, and the procedural argument that the Forest Service
should have identified pre-existing rights of way prior to adoption
of the 2008 Plan.

a.    **Whether These Claims' Substantive Theory Rests on**
**Adverse Claims of Title to Real Property**

Plaintiffs argue that the challenged claims need not be
brought under the QTA because "[t]he primary issue in this lawsuit
is not a question of 'title.'   The primary issue is 'closure,' and
the Forest Service's right to do so."   Opp'n to Mot. to Dismiss at

---

[14] These are a subset of the claims challenged on ripeness
grounds.   The court summarized each of these claims in note 10,
above.

1   13.  The distinction plaintiffs attempt to draw collapses, however,

2   where plaintiffs argue that the Forest Service lacks the right to

3   close a road because of an easement or other property interest in

4   the road.

5                  **i.   R.S. 2477 Roads (Claims VIII and IX)**

6        Some of plaintiffs' claims are clearly predicated on property

7   interests.  Claims VIII and IX argue that the Forest Service lacked

8   the authority to close certain roads because public highways had

9   been established thereon pursuant to R.S. 2477.  Compl. ¶¶ 165-174.

10  Under R.S. 2477 and the related statutes, establishment of a

11  highway created a right of way, which is an easement and thus a

12  property right.  Sierra Club v. Hodel, 848 F.2d 1068, 1083 (10th

13  Cir. 1988), overruled on other grounds by Los Ranchos De

14  Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir. 1992) (en banc).

15  This property right vests in the local county.  Id.  The plan did

16  not recognize R.S. 2477 rights on closed roads, demonstrating that

17  the United States disputes plaintiffs' contention that such rights

18  exist.  Two lines of caselaw, when combined, demonstrate that the

19  plaintiffs here cannot bring suit to vindicate disputed R.S. 2477

20  rights.

21       First, as noted above, where a claim disputes the United

22  States' title, the claim cannot be brought under the APA.  Alaska

23  II, 75 F.3d at 453.  The Ninth Circuit has specifically held that

24  a claim under the APA is barred by sovereign immunity where the APA

25  claim sought a determination that would, in effect, vest in a third

26  party property rights adverse to the United States.  Metropolitan

                                  39

Water Dist. v. United States, 830 F.2d 139, 143 (9th Cir. 1987)
(per curiam), aff'd sub nom. California v. United States, 490 U.S.
920 (1989); see also Alaska v. Babbitt, 38 F.3d 1068, 1074 (9th
Cir. 1994) ("Alaska I") (The QTA governs "suits involving
plaintiffs who, while not seeking to quiet title in themselves,
might potentially affect the property rights of others through
successfully litigating their claims."). The Seventh Circuit has
rejected claims similar to those at issue here, largely on the
basis of Metropolitan Water Dist. Shawnee Trail Conservancy v.
USDA, 222 F.3d 383, 386 (7th Cir. 2000). In Shawnee Trail
Conservancy, plaintiffs argued that designation of areas of a
National Forest as Research Natural Areas, and concomitant closure
of roads and trails, violated easements and rights of way owned by
third party public and private entities. Id. The Seventh Circuit
held that the QTA precluded plaintiffs' APA claim, despite the fact
that plaintiffs did not themselves seek title in any property
interest. Id. at 387-88 (citing Metropolitan Water Dist., 830 F.2d
at 143-44). Thus, plaintiffs' claims predicated on the existence
of R.S. 2477 rights not acknowledged by the Forest Service cannot
be brought under the APA.

A second line of cases holds that plaintiffs cannot bring
their substantive R.S. 2477 claims under the QTA either. "Courts
which have addressed whether a plaintiff, as a member of the
public, can assert a title under the Quiet Title Act for access to
routes established pursuant to R.S. 2477 have ruled that there is
no subject matter jurisdiction." Friends of Panamint Valley v.

1  <u>Kempthorne</u>, 499 F. Supp. 2d 1165, 1175 (E.D. Cal. 2007) (O'Neill,
2  J.) (following <u>Sw. Four Wheel Drive Ass'n v. BLM</u>, 363 F.3d 1069
3  (10th Cir. 2004), <u>Long v. Area Manager, Bureau of Reclamation</u>, 236
4  F.3d 910, 915 (8th Cir. 2001), and <u>Kinscherff v. United States</u>, 586
5  F.2d 159, 160 (10th Cir. 1978)); <u>see also</u> <u>Hazel Green Ranch, LLC</u>
6  <u>v. United States DOI</u>, No. 07-CV-00414, 2008 U.S. Dist. LEXIS 87367,
7  10-11 (E.D. Cal. Oct. 27, 2008) (Wanger, J.) (following <u>Panamint</u>),
8  <u>Alleman v. United States</u>, 372 F. Supp. 2d 1212, 1225 (D. Or. 2005).
9  These cases have reasoned that the right to use a public road is
10 not itself a right or interest in property.  The QTA requires the
11 plaintiff to set forth "the nature of the right, title, or interest
12 *which the plaintiff claims* in the real property."  28 U.S.C. §
13 2409a(d) (emphasis added), <u>see also</u> <u>McMaster v. United States</u>, 177
14 F.3d 936, 939 (11th Cir. 1999) (for suit to be available under the
15 QTA, the "dispute . . . must concern the quality of title between
16 the plaintiff and the United States and not the quality of title
17 between the United States and a third party.").  Thus, a suit
18 seeking to assert an R.S. 2477 right must be brought by "the
19 governmental entity that owns the easement."  <u>Long</u>, 236 F.3d at
20 915).

21     The court recognizes that plaintiffs claim an interest (albeit
22 not a real property interest) in use of disputed R.S. 2477 roads.
23 The United States has not chosen to waive sovereign immunity in a
24 way that permits plaintiffs to seek to vindicate this interest.
25 As the Ninth Circuit has explained in discussing another context
26 in which plaintiffs were barred from seeking relief, "[t]he QTA's

1   limitations on actions challenging the United States' assertions

2   of title apply without regard to the ultimate validity of those

3   assertions. . . . [T]he immunity of the government applies whether

4   the government is right or wrong."   Alaska II, 75 F.3d at 452

5   (internal quotations omitted).   Insofar as plaintiffs' eighth and

6   ninth claims assert that the Forest Service's authority to require

7   notices of intent or plans of operation is substantively limited

8   by the existence of disputed R.S. 2477 rights, those claims are

9   barred by sovereign immunity.

10                  **ii.   Private Easements (Claim XVI)**

11        Plaintiffs' sixteenth claim alleges that plaintiffs' mining

12   claims and mineral estates give rise to "implied easements by

13   necessity over the roads, trails, and rights of way in the ENF,"

14   and that the Forest Service's actions violate these easement

15   rights.   Compl. ¶¶ 210-212.   Such easement rights are property

16   rights within the scope of the QTA.   Alaska I, 38 F.3d at 1074

17   (collecting cases).   Although claim XVI does not invoke a

18   particular cause of action, the parties agree that this claim, as

19   pled, is not brought under the QTA.   Opp'n to Mot. to Dismiss at

20   35-36.

21        Although it is unclear whether the United States disputes the

22   *existence* of such easements, the parties at a minimum dispute such

23   easements' *scope*.   The EIS and Forest Service regulations recognize

24   that miners have existing rights of access, and this may be a

25   recognition of easement rights.   Plaintiffs' only ripe claim

26   regarding easements, however, asserts the Forest Service lacks any

authority to restrict plaintiffs' use of these easements, whereas defendants contend that whatever the nature of plaintiffs' rights, plaintiffs do not have a right so broad as to prohibit such regulation. Disputes about the scope of an easement, like disputes about whether an easement exists at all, must be brought under the QTA. <u>Kane County</u>, 562 F.3d at 1088-89.

Insofar as plaintiffs contend that easement rights owned by plaintiffs deprived the Forest Service of authority to regulate certain roads, this claim can only be brought under the QTA. <u>Montanans for Multiple Use v. Barbouletos</u>, 568 F.3d 225, 228-229 (D.C. Cir. 2009), <u>Kane County</u>, 562 F.3d at 1088, <u>Duval Ranching Co. v. Glickman</u>, 965 F. Supp. 1427, 1444-45 (D. Nev. 1997).

### iii. Claims Asserting other "Rights-of-Way" (Counts II, VI, VII, and XVII)

Defendants further argue that plaintiffs' second, sixth, seventh, and seventeenth claims are similarly barred. Each of these claims similarly argues, at least in part, that the Forest Service lacked authority to close roads because of rights of way across Federal Land, whether enjoyed by the public in general or by miners in particular. <u>See</u> Compl. ¶¶ 106, 154, 158, 214.

The nature of these purported rights of access is unclear. Mining claims, whether patented or not, are real property. <u>United States v. Shumway</u>, 199 F.3d 1093, 1100 (9th Cir. 1999). This suggests that any right of access existing as a result of the mining claim is also a real property interest. <u>See</u> <u>Duval Ranching Co.</u>, 965 F. Supp. at 1445 (claims asserting that road closures

43

1  violated miners' "inherent rights" must be brought under the QTA).
2  Insofar as plaintiffs invoke statutory protections of miners'
3  rights, however, it is not immediately apparent whether these
4  statutes direct the Forest Service to protect miners' property
5  rights, or whether these statutes somehow create an independent
6  obligation to leave the National Forest open to mining generally.
7  Nor is it clear whether the latter would be a property right.
8  Similarly, it is not clear that a statute providing the public with
9  access to the National Forests creates a property right in such
10 access or a cloud on the United States' title.  No party has
11 confronted these questions.

12      The court declines to reach these issues on the present
13 motion.  Instead, the court dismisses these claims for the reasons
14 explained in the remainder of this order.  If plaintiffs are able
15 to cure the other jurisdictional defects, doing so will present a
16 more complete context in which to revisit these issues.

17           **b.   Claims Arguing That The Forest Service Must**
18                **Consider Whether Rights-of-Way Are Present Need Not**
19                **Be Brought under the QTA**

20      As discussed above, the court construes plaintiffs' complaint
21 as arguing that the Forest Service was obliged to determine whether
22 rights of way existed prior to adopting the 2008 Plan.  In Kane
23 County, the Tenth Circuit held that such a claim did not challenge
24 the United States' title.  There, plaintiffs sought to compel the
25 federal defendants to "determine [p]laintiffs' valid existing
26 rights before asserting or taking any action in enforcement or

1  implementation of [the challenged plan]" and to "remove any
2  physical barriers placed upon any right-of-way or road within the
3  [subject lands] until such time as it has been determined that such
4  actions will not impair valid existing rights." 562 F.3d at 1082;
5  see also id. at 1088. Thus, rather than arguing that defendants
6  had substantively interfered with plaintiffs' property rights,
7  plaintiffs argued that defendants have a procedural, 'stop and
8  think' obligation prior to acting.

9      Kane County held that "nothing in the Quiet Title Act
10 necessarily preclude[d]" this claim. Id. at 1088; accord Duval
11 Ranching Co., 965 F. Supp. at 1445. The court agrees. In the same
12 breath, however, Kane County dismissed the claim on the merits,
13 explaining that plaintiffs had "failed to point to any provision
14 of federal law that would require the BLM to perform the actions
15 they are seeking (i.e., the non-binding administrative
16 determination of their purported rights-of-way). In other words,
17 Quiet Title Act aside, the County plaintiffs' APA-based claims lack
18 merit." 562 F.3d at 1088 (footnote omitted). The court postpones
19 evaluation of the merits of these claims.

20              c.    **Summary of the QTA and Sovereign Immunity**

21     Defendants argue that the counts II, VI through IX, XVI and
22 XVII exceed the limited waiver of sovereign immunity embodied by
23 the QTA. The court addresses this argument only insofar as these
24 claims were found to be ripe. The court concludes that counts
25 XVIII, IX, and XVI are barred by sovereign immunity insofar as they
26 involve the ripe substantive argument. The court does not

                                  45

1   determine whether sovereign immunity bars the substantive argument

2   as advanced by counts II, VI, VII and XVII, instead dismissing this

3   aspect of these claims on other jurisdictional grounds.  Sovereign

4   immunity does not bar the procedural argument at all.

5        **4.    Sovereign Immunity and Plaintiffs' Takings and Damages**

6            **Claims (Counts XVIII and XX)**

7        Count XVIII of the complaint alleges that the 2008 Plan

8   effectuated a taking for which plaintiffs have not received

9   compensation.  Count XX is a general claim for "damages."  These

10  claims are ripe only insofar as they allege that the Forest Service

11  lacked any authority to regulate miners' use of roads or that the

12  Forest Service was required to inventory rights of way.

13  Plaintiffs' complaint seeks "such damages as are proven at trial,"

14  without specifying an amount.  Compl. at 71.

15       As noted, claims against the United States are barred absent

16  a waiver of sovereign immunity.  Plaintiffs have identified no

17  waiver applicable to these claims.  Defendants argue that the only

18  potential waivers are those found in the Tucker Act and Little

19  Tucker Act, 28 U.S.C. §§ 1491(a)(1) and 1346(a)(2), respectively.

20  Both waive sovereign immunity for claims for money damages against

21  the United States "founded either upon the Constitution, or any Act

22  of Congress, or any regulation of an executive department."  The

23  Little Tucker Act, however, solely conveys jurisdiction over claims

24  for $10,000 or less, and the Tucker Act solely conveys jurisdiction

25  on the Federal Court of Claims.  See Christopher Vill., L.P. v.

26  United States, 360 F.3d 1319, 1332 (Fed. Cir. 2004) (citing E.

1  Enters. v. Apfel, 524 U.S. 498, 520 (1998)).

2     If plaintiffs seek to proceed before this court, and if
3  plaintiffs identify no waiver of sovereign immunity other than the
4  Little Tucker Act, plaintiffs must waive the right to recover
5  greater than $10,000 in damages per claim.  Smith v. Orr, 855 F.2d
6  1544, 1553 (Fed. Cir. 1988) (citing, inter alia, United States v.
7  Johnson, 153 F.2d 846, 848 (9th Cir. 1946)); see also Clouser, 42
8  F.3d at 1539-40 ("Since plaintiffs in their complaint allege
9  damages in excess of $ 10,000, . . . they are disqualified from
10  suing in the [District of Oregon].").

11     Defendants argue that such a waiver must appear in the
12  complaint itself.  The court need not decide this issue.  Even if
13  defendants are correct, the court must examine the remaining
14  jurisdictional challenges to these claims, so as to determine
15  whether the Federal Court of Claims would have jurisdiction if this
16  court were to transfer the case.  Because plaintiffs lack standing
17  to bring these claims, no federal court has jurisdiction.
18  Plaintiffs are cautioned, however, to be prepared to respond to the
19  above issues if plaintiffs file an amended complaint.

20     **5.    Sovereign    Immunity    and    Plaintiffs'    Regulatory**
21          **Flexibility Act Claim**

22     Count XIV of the complaint alleges that the Forest Service
23  violated the Regulatory Flexibility Act by failing to prepare an
24  "initial regulatory flexibility analysis" for the 2008 Plan in
25  purported violation of 5 U.S.C. § 603(b)-(c).  Defendants argue
26  that plaintiffs have failed to exhaust administrative remedies with

1  respect to this claim.  The Ninth Circuit has held that a plaintiff

2  challenging administrative action by the Forest Service must

3  exhaust administrative remedies before filing suit.  <u>Native</u>

4  <u>Ecosystems Council v. Dombeck</u>, 304 F.3d 886, 899 (9th Cir. 2002)

5  (citing 5 U.S.C. § 704, 7 U.S.C. § 6912(e)).

6      Defendants assert, without citation to authority, that this

7  exhaustion requirement is jurisdictional.  The Ninth Circuit has

8  explicitly held to the contrary, although the issue is one that has

9  engendered significant confusion among the courts.  <u>McBride Cotton</u>

10 <u>& Cattle Corp. v. Veneman</u>, 290 F.3d 973, 976 (9th Cir. 2002) (7

11 U.S.C. § 6912(e) is non-jurisdictional); <u>Idaho Watersheds Project</u>

12 <u>v. Hahn</u>, 307 F.3d 815, 828 n.5, 830 (9th Cir. 2002) (in a suit

13 against the Forest Service, holding that "5 U.S.C. § 704 [is] a

14 non-jurisdictional statutory exhaustion requirement"), <u>but see</u>

15 <u>Doria Mining & Engineering Corp. v. Morton</u>, 608 F.2d 1255, 1257

16 (9th Cir. 1979) (in reviewing a claim against the Department of

17 Interior, holding that "When the regulations governing an

18 administrative decision-making body require that a party exhaust

19 its administrative remedies prior to seeking judicial review, the

20 party must do so before the administrative decision may be

21 considered final and the district court may properly assume

22 jurisdiction.") (citing, <u>inter alia</u>, 5 U.S.C. § 704).[15]

23 Nonetheless, as a practical matter, because defendants raise

24

---

25    [15]  Exhaustion may also (or, depending on the analysis,
   accordingly) be waived.  Defendants' present motions do not argue
26 that plaintiffs failed to exhaust any of their other claims, and
   the court need not consider this issue <u>sua sponte</u>.

1  exhaustion and make no other purported jurisdictional challenges

2  to this claim, it does not matter whether exhaustion is

3  jurisdictional; it suffices to note that under Native Ecosystems

4  Council, etc., the requirement is mandatory absent exceptions not

5  relevant here.  304 F.3d at 899.

6      Defendants concede that some plaintiffs invoked administrative

7  remedies by commenting on the draft EIS and by filing some appeals

8  of the decision.  See Defs.' Mem. Supp. Mot. Dismiss at 47.

9  Nonetheless, defendants contend that no person invoked the

10  Regulatory Flexibility Act in these proceedings.

11      In determining how specific plaintiffs must be during

12  administrative proceedings in order to exhaust an issue, the Ninth

13  Circuit has explained that "[t]he plaintiffs have exhausted their

14  administrative appeals if the appeal, taken as a whole, provided

15  sufficient notice to the Forest Service to afford it the

16  opportunity to rectify the violations that the plaintiffs alleged."

17  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899 (9th Cir.

18  2002).  In Native Ecosystems Council, the Ninth Circuit held that

19  plaintiffs' administrative appeals were "less refined" than the

20  judicial complaint, in that the administrative appeals failed to

21  argue that an EIS was required for a proposed Forest Plan amendment

22  or that the Forest Service was required to consider the cumulative

23  significance of all road density amendments.  Id. at 898.  The

24  administrative appeals nonetheless objected to the road density

25  amendments generally and argued that the process by which the

26  amendments were adopted violated NFMA's procedural requirements,

1  the source of the EIS requirement in that case.  Id. at 899.  The

2  court held that plaintiffs' administrative filings were sufficient

3  to put the Forest Service on notice of the disputed issues, and

4  that plaintiffs had exhausted their claims.

5      In contrast, the Ninth Circuit held that a plaintiff had

6  failed to exhaust claims in Buckingham v. Sec'y of the USDA, 603

7  F.3d 1073 (9th Cir. 2010).  Plaintiff had a permit to graze cattle

8  in a national forest, the Forest Service cancelled this permit, and

9  plaintiff challenged this cancellation under the APA.  Id. at 1076.

10  During administrative proceedings, plaintiff argued that other

11  ranchers' non-compliance with their permit obligations precluded

12  plaintiff from complying with the terms imposed by his permit.  Id.

13  at 1081.  The court held that under Native Ecosystems Council, this

14  was insufficient to exhaust plaintiff's argument that the terms of

15  his own permit were vague.  Id.

16      Here, plaintiff Hobbs argued during the administrative process

17  that "[c]los[ing] the roads to small miners and prospectors" would

18  impose an economic hardship on said miners.  Pls.' Opp'n to Mot.

19  Dismiss, 33.  This argument plainly challenges the substance of the

20  decision to close roads.  Plaintiffs' Regulatory Flexibility Act

21  claim concerns administrative burdens, rather than access to the

22  roads themselves.  Plaintiffs argue that the Forest Service was

23  required to describe the "projected reporting, recordkeeping and

24  other compliance requirements of the proposed rule" and other

25  "relevant Federal rules which may duplicate, overlap, or conflict

26  with the proposed rule."  Compl. ¶ 198.  Plaintiffs' apparent

50

failure to even mention this sort of administrative burden during the administrative process demonstrates that plaintiffs failed to put the Forest Service on notice of the basis for plaintiffs' Regulatory Flexibility Act claim, and this claim is therefore unexhausted.

Separate from the Regulatory Flexibility Act argument, count XIV of the complaint further asserts that defendants have violated 43 U.S.C. § 1732(b), which provides that "the Secretary shall, . . . regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, . . . the development of small trade or manufacturing concerns." See Compl. ¶ 200.  The court agrees that "Secretary," as used in this section, refers solely to the Secretary of the Interior, such that this statute does not apply to the defendants in this suit.  Western Mining Council v. Watt, 643 F.2d 618, 625 (9th Cir. 1981), 43 U.S.C. § 1702(g).

### 6.  Standing

Defendants' final jurisdictional argument is that plaintiffs lack standing to bring claims II through IX, XI through XIII, XVI through XVIII, and XX.[16]  To demonstrate Article III standing,

> a plaintiff must show that he is under threat
> of suffering "injury in fact" that is concrete
> and particularized; the threat must be actual

---

[16] Put differently, defendants do not challenge plaintiffs' standing to bring claims I, X, XIV, XV, and XIX.  Plaintiffs stipulate to dismissal of claim XV, and the court has dismissed claims X and XIV on the merits.  Thus, the only surviving claims as to which defendants do not challenge standing are I, for violation of NEPA, and XIX, a general prayer for injunctive relief.

> and imminent, not conjectural or hypothetical;
> it must be fairly traceable to the challenged
> action of the defendant; and it must be likely
> that a favorable judicial decision will
> prevent or redress the injury.

Summers v. Earth Island Inst., ___ U.S. ___, ___, 129 S. Ct. 1142, 1149 (2009) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Defendants solely challenge plaintiffs' showing of injury. The parties' dispute on this issue is narrow. Defendants characterize the challenged claims as resting on the injury of interference with access to particular mining claims. Plaintiffs embrace this interpretation of the injury at issue.[17] The parties further agree that to demonstrate such an injury, plaintiffs will ultimately be required to specify particular mining claims and particular road closures that limit plaintiffs' ability to access those claims. Plaintiffs have not done so.

The evidence demonstrates that plaintiffs could provide these specific facts now, although plaintiffs contend to the contrary. At the time the FEIS and ROD were issued, around March 31, 2008, the Forest Service made available a map showing all roads open for public use under the 2008 Plan. Decl. of Lester Lubetkin dated

---

[17] It appears that other injuries are possible. The court does not inquire into these possible injuries, leaving it to plaintiffs to assert these injuries as a basis for standing, if appropriate, in a future filing. Nor does the court look beyond plaintiffs' implicit concession that interference with the ability to access particular mining claims is necessary to convey standing for plaintiffs' procedural theories of liability regarding identification of R.S. 2477 claims.

1   Apr. 20, 2010, at ¶¶ 3, 8, and Ex. 1.  This map was made available

2   online, at meetings which plaintiffs Bunting and Burleson signed

3   in as attending, and was mailed to Bunting, Burleson, and all

4   others who submitted comments on the earlier draft EIS.  <u>Id.</u> ¶ 8.

5   The Forest Service subsequently produced "Motor Vehicle Use Maps"

6   in March 2009, which pertain to each district within the ENF, and

7   which have been freely available online and at district offices

8   since that time.  Because the 2008 Plan prohibits the general

9   public from using roads not explicitly designated as open, these

10  maps should enable plaintiffs to determine whether the roads needed

11  to access specific mining claims are open to public use.

12       Plaintiffs respond to this evidence by arguing that the Forest

13  Service should have provided a map indicating specifically which

14  roads were closed, in addition to a map showing which roads remain

15  open.  Plaintiffs provide no logical argument as to why such a map

16  would be necessary, nor do plaintiffs identify any legal obligation

17  to produce such a map.  Moreover, the FEIS map showing roads open

18  under the 2008 Plan was accompanied by a map showing all roads in

19  the ENF of which the Forest Service was aware, including previously

20  unauthorized roads.  <u>Id.</u> Ex. 2.  This second map was also

21  distributed to plaintiffs Bunting and Burleson.  Comparison of this

22  map with the others reveals which roads were closed.

23       Plaintiffs further argue that these maps are vague in that

24  they "lack information such as context [and] landmarks," that the

25  maps are "often broken up where the route crosses private land,"

26  and that they "assume that users can tell the difference between

1  a route on the map, or a spur omitted from the map." Plaintiffs
2  have not identified how any of these purported difficulties apply
3  to the roads needed to access any particular claim.

4       The only remaining dispute is plaintiffs' contention that they
5  "are not required to plead the name and location of every road
6  closed in the ENF that causes them harm; that awaits discovery."
7  Opp'n to Mot. to Dismiss, 36:4-6; see also, e.g., id. at 13:08-11,
8  16:07-08.  Courts have held that when standing is challenged "at
9  the pleading stage, 'general factual allegations of injury
10 resulting from the defendant's conduct may suffice,' because we
11 '"presume that general allegations embrace those specific facts
12 that are necessary to support the claim."'"  Or. v. Legal Servs.
13 Corp., 552 F.3d 965, 969 (9th Cir. 2009) (quoting Lujan v.
14 Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quoting Lujan v.
15 Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).  The court is
16 furthermore sensitive to the need to avoid imposition of heightened
17 pleading requirements.  See, e.g., Connecticut v. Am. Elec. Power
18 Co., 582 F.3d 309, 333 (2d Cir. 2009).  Nonetheless, in this case,
19 it is appropriate to require greater specificity at this stage.
20 The caselaw permits the defendants to challenge the truth and
21 sufficiency of the jurisdictional allegations in a 12(b)(1) motion
22 on a standard similar to that used for summary judgment.  Farr, 990
23 F.2d at 454.  On such a challenge the plaintiff is entitled to the
24 procedural protections afforded at the summary judgment stage.  Id.
25 at 454 n.1.  One such protection is the right to postpone
26 adjudication pending necessary discovery.  Id. at 454, see also

1  Fed. R. Civ. P. 56(f)(2).  In this case, however, plaintiffs have
2  not identified any need for discovery on this jurisdictional
3  question.   Nor have plaintiffs identified any other factor
4  preventing plaintiffs from providing this specificity now.  Rule
5  56(f) provides that a motion for summary judgment may be postponed
6  or denied where opposing party shows "that, *for specified reasons*,
7  it cannot present facts essential to justify its opposition."
8  (emphasis added).  Plaintiffs have not provided such reasons here.

9       Accordingly, plaintiffs have not demonstrated standing to
10 bring claims II through IX, XI through XIII, XVI through XVIII, and
11 XX.

12 **D.   Remaining Merits Arguments**

13      The above analysis fully disposes of defendants' motion to
14 dismiss.  Plaintiffs abandon claim XV, the court dismisses claims
15 X and XIV on the merits, and defendants do not seek dismissal of
16 claims I and XIX.  The remaining claims are dismissed for lack of
17 jurisdiction, on the basis of a number of jurisdictional defects.

18      The court emphasizes that it has not reached the merits of the
19 jurisdictionally defective claims.   In order to guide future
20 litigation of this case, the court has noted various cases
21 potentially pertinent to the merits of these claims, but the court
22 has not determined that these cases provide the controlling rules
23 or apply to this case.  Conversely, plaintiffs should not take the
24 court's silence on merits arguments raised by defendants as an
25 indication that those arguments have been rejected.

26 ////

### III. Motion for a More Definite Statement

Fed. R. Civ. P. 12(e) provides in pertinent part that

> A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired.

Because of the liberality of the notice pleading system, such a motion will be granted only in rare circumstances. The Ninth Circuit has held that the federal rules ordinarily do not require the pleader to set forth "the statutory or constitutional basis for his claim, only the facts underlying it." McCalden v. California Library Ass'n, 955 F.2d 1214, 1223 (9th Cir. 1990) (reviewing a Rule 12(b)(6) motion); but see Balistreri, 901 F.2d at 699 (complaint may be dismissed under Rule 12(b)(6) where complaint fails to support "a cognizable legal theory."). "A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her." San Bernardino Pub. Employees Ass'n v. Stout, 946 F. Supp. 790, 804 (C.D. Cal. 1996). A motion for a more definite statement should be denied "where the information sought by the moving party is available and/or properly sought through discovery." Famolare, Inc. v. Edison Bros. Stores, Inc., 525 F. Supp. 940, 949 (E.D. Cal. 1981). "Thus, a motion for a more definite statement should not be granted unless the

defendant literally cannot frame a responsive pleading." <u>Bureerong v. Uvawas</u>, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996) (citing <u>Boxall v. Sequoia Union High School District</u>, 464 F. Supp. 1104, 1114 (N.D. Cal. 1979)).

In this case, defendants argue that plaintiffs' first claim must be more definitely stated not because the allegations are too scant, but because the allegations are so plentiful and unstructured as to be unintelligible. Plaintiffs' first claim, as labeled by plaintiffs, alleges that defendants violated NEPA, and plaintiffs' opposition to the present motion acknowledges that such claims are brought under the APA, 5 U.S.C. § 706(2). Belying this simple summary, the complaint as pled consists of twenty-four lengthy paragraphs covering eleven pages, with more than thirty citations to various legal authorities that do not clearly relate to any recognizable claim under NEPA. Defendants accurately summarize these issues:

> it is unclear whether Plaintiffs are alleging a single claim or multiple claims under NEPA through Claim I. Plaintiffs have pled that the Decision violates NEPA under a single Claim in their Complaint, but appear to assert several violations of NEPA. For example, some paragraphs seem to relate to the alternatives analysis required under NEPA, <u>see e.g.</u>, <u>id.</u> at ¶84, ¶91, and ¶98, while other paragraphs seem to relate to the cumulative impacts analysis required by NEPA, <u>see e.g.</u>, <u>id.</u> at ¶89, ¶95 - 96. As a third potential claim, Plaintiffs seem to assert the novel concept that the Forest Service failed to produce a supplemental environmental impact statement ("SEIS") before completing the FEIS. . . .
>
> The unreasonableness of having to develop a responsive pleading is underscored by the

57

1         inclusion of several paragraphs that make
     little or no reference to NEPA, and it is
2         unclear whether Plaintiffs intend for some of
     these allegations to present new non-NEPA
3         related claims, or whether Plaintiffs intend
     these paragraphs to serve some other purpose.
4         <u>See e.g.</u>, Complaint at ¶85 (alleging violation
     of the Omnibus Consolidated Appropriations Act
5         of 1997), ¶89 (alleging violations of
     Executive Orders 12291 and 12866, and ¶92
6         (alleging statutory rights to mine and
     prospect in the ENF). While Plaintiffs may or
7         may not have a purpose in including such
     paragraphs under Claim I, it clearly does not
8         serve the purpose of a pleading according to
     Rule 8 and is amenable to relief under Rule
9         12(e). Any amended complaint should be more
     concise, and identify only those factual
10        allegations truly relevant to Plaintiffs' NEPA
     claim(s).

11

12   Defs.' Mem. Supp. Mot. for More Definite Statement, 6-7. The court

13   agrees that defendants cannot frame a response to this claim. The

14   Ninth Circuit has held that "even though a complaint is not

15   defective for failure to designate the statute or other provision

16   of law violated, the judge may in his discretion, in response to

17   a motion for more definite statement under Federal Rule of Civil

18   Procedure 12(e), require such detail as may be appropriate in the

19   particular case." <u>McHenry v. Renne</u>, 84 F.3d 1172, 1179 (9th Cir.

20   1996). <u>McHenry</u> described the complaint at issue as "argumentative,

21   prolix, replete with redundancy, and largely irrelevant." <u>Id.</u> at

22   1177. The allegations here are argumentative, prolix, and

23   redundant, and neither the court nor defendants can determine

24   whether they are irrelevant.

25       Accordingly, defendants' motion for a more definite statement

26   is granted. Plaintiffs are ordered to file an amended complaint,

splitting the allegations currently contained in Count I into separate causes of action for each theory of liability.  In these separate causes of action, plaintiffs must identify the challenged aspect of the plan or conduct of defendant, the right offended, and the source of that right.  Where plaintiffs contend that a right is protected under multiple sources of authority or has been violated in multiple ways, these arguments should be laid out in separate causes of action.

## IV. Conclusion

For the reasons stated above, defendants' motion for a more definite statement (Dkt. No. 28) and motion to dismiss (Dkt. No. 29) are GRANTED.  The Court ORDERS as follows:

1.  Claim I is dismissed with leave to amend, as explained above.

2.  Claim XV is DISMISSED WITH PREJUDICE, in light of plaintiffs' non-opposition to dismissal thereof.

3.  Claims X and XIV are DISMISSED FOR FAILURE TO STATE A CLAIM. Dismissal of these claims is WITHOUT PREJUDICE. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1108 (9th Cir. 2003) (Initial dismissal under Fed. R. Civ. P. 12(b)(6) should ordinarily be without prejudice).

4.  Claims II through IX, XI through XIII, XVI through XVIII, and XX are DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.  Plaintiffs may file an amended complaint seeking to cure the jurisdictional deficiencies identified above.

5.  Plaintiffs are granted twenty-eight (28) days from the
     date of this order to file an amended complaint.

IT IS SO ORDERED.

DATED:  August 5, 2010.


LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT